**CENTRAL OHIO COOPERATIVE MILK PRODUCERS, INC.,
Appellant, v. GLANDER, Appellee.**

Board of Tax Appeals

No. 16127. Decided November 25, 1949.

Willis H. Liggett, Columbus, for appellant.

Herbert S. Duffy, Atty. Genl., W. H. Annat, Asst. Atty. Genl., Columbus, for appellee.

### OPINION

This is an appeal from a final order of the Tax Commissioner under date of April 5, 1949, denying an application for review and correction and confirming a certification thereto-

fore made respecting the appellant corporation's franchise tax assessment for the tax year 1948. The cause now comes on for final disposition upon the notice of appeal, the Commissioner's transcript, the record made before an attorney examiner and briefs of counsel.

Appellant taxpayer is a domestic cooperative association incorporated under favor of §§10186-1 to 10186-30 GC, inclusive. It came into existence on December 6, 1938. The gist of the present complaint is displayed by the appellant's notice of appeal, from which we quote:

(1) "The provisions of §5495 et seq, GC, insofar as it is intended to include corporations not for profit thereunder for franchise tax purposes are discriminatory, unconstitutional and void and Appellant is not liable for said tax.

(2) "The true value of the stock of the Appellant, were it subject to said franchise tax, has been incorrectly determined by an inclusion therein of the following:
>(a) $14,927.97 Bad Debt Cont.
>(b) $18,050.45 Undistributed refunds for prior years."

We shall delay the recitation of operative facts relating to the second claimed error until the first has been disposed of as it is purely a question of law. In the order complained of, the Tax Commissioner states that he is without power or authority to consider or question the constitutionality of an act of the legislature. This Board is subject to the same inhibition. It has no such authority. It, however, does have the right to consider if appellant has been discriminated against and if the Commissioner's order is void as being contrary to existing law.

By the terms of its charter and in accordance with the provision of §10186-1 GC appellant is an association not for profit. This noted section reads in part:

"* * *. Associations organized hereunder shall be deemed 'non-profit,' inasmuch as they are not organized to make profit for themselves, as such, or for their members, as such, but only for their members as producers."

When it sought and obtained corporate existence, it, of course, tacitly agreed to accept the statutory burdens cast upon it as well as enjoyment of the benefits accruing to it under the Act which countenanced its being. It also was required to abide by any change, modification or amendment

of the statutes embraced within the Act—§§10186-1 to 10186-30 GC, inclusive, which made its existence possible. Under the provisions of §10186-29 GC appellant gained a preferential status which ordinary corporations organized for profit or not for profit did not then and do not now possess. This section provided that:

"Each association organized hereunder shall pay into the state treasury an annual fee of ten ($10) dollars only, in lieu of all franchise or license or corporation or taxes or charge upon reserves held by it for members."

This section was a part of the original Act. The General Assembly (122 O. L. 161) (163) saw fit to withdraw this favor from such associations and to that end repealed the section, the effective date thereof being September 4, 1947. Sec. 10186-20 GC, under the title of Exemptions, provided, in part, that:

"Any provisions of law which are in conflict with this act (§§10186-1 to 10186-30 GC) shall be construed as not applying to the associations herein provided for."

It was then clear that franchise taxes might not be assessed against appellant and like associations in a sum greater than ten dollars as provided in §10186-29 GC. The Act, however, contained another section, that is, §10186-28 GC, which provides that:

"The provisions of the general corporation laws of this state and all powers and rights thereunder, shall apply to the association organized hereunder, except where such provisions are in conflict with or inconsistent with the express provisions of this act."

It, therefore, becomes equally clear that as of September 4, 1947, when the legislature repealed §10186-29 GC, cooperative associations organized and existing under this Act became amenable to general corporation laws, which is to say that §§5498, 5498-1 and 5495-2 GC became operative. We quote their applicable provisions:

Sec. 5498 GC:

"* * *. For the purpose of this act (Excise and Franchise Taxes on Corporations—§5485 et seq GC), the value of the issued and outstanding shares of stock of any such corporation shall be deemed to be the total value, as shown by the books of the company, of its capital, surplus, whether earned

or unearned, undivided profits, and reserves, but exclusive of (a) proper and reasonable reserves for depreciation, and depletion as determined by the tax commission (tax commissioner), (b) taxes due and payable during the year for which such report was made, (c) the item of good will as set up in the annual report of the corporation when said annual report is accompanied by certified balance sheet showing such item of good will carried as an asset on the books of the company, * * *(d) such further amount as upon satisfactory proof furnished by the corporation, the tax commission may find to represent the amount, if any, by which the value of the assets (other than good will) of the corporation as carried on its books exceeds the fair value thereof. * * *."

**Sec. 5498-1 GC:**

"The phrase 'issued and outstanding shares of stock' as used in §5498 GC shall apply to corporations not for profit and shall include but shall not be limited to mean membership certificates and other instruments evidencing ownership of an interest in such corporation not for profit."

**Sec. 5495-2 GC:**

"Annually; * * *, each corporation, incorporated under the laws of this state for profit and each corporation not for profit organized under §§10185 and **10186 GC** and §§10186-1 and **10186-30 GC,** both inclusive, * * *, shall make a report in writing to the tax commissioner in such form as the tax commissioner may prescribe. * * *." ·

It will be noted that the effective date of this section (§5495-2 **GC, September 4, 1947**) is the same as that of the repeal of §10186-29 GC hereinbefore set forth. A review of these statutes clearly indicates that cooperative associations are now subject to the payment of franchise taxes just the same as all general corporations. It is the judgment of the Board of Tax Appeals that appellant has not been discriminated against and that the Tax Commissioner was fully empowered by statute to assess the taxpayer for franchise taxes in accordance with general law. It is the observation of the Board, but not its holding, that it is unable to conceive of the unconstitutionality of the statutes questioned from any viewpoint.

Turning now to the second branch of appellant's complaint, the question comes: Was the reserve of $14,927.97 set up for

Bad Debt Contingency improperly included by the Commissioner in determining the value of the taxpayer's stock? If it is a proper deductible item, it is so because of that portion of §5498 GC hereinbefore quoted and particularly that portion thereof under subdivision (d). We are told by appellant that the title given to this reserve is a misnomer created by the company's accountant and that it is, in fact, a fund created for the purpose of protecting producers of milk from any loss due to default of any handler or distributor. The appellant's contracts with the producers covenant to protect them against any such contingency. It is evidenced that appellant markets the producers' product among twenty some distributors in the Columbus area; that a four weeks average business runs around $200,000.00 of which appellant makes direct payment thereof of 10% to the producers, the remaining 90% being paid indirectly to the producers through other channels than appellant's office. Since the corporation's inception it has sustained but one such loss of $4,000.00 in and about the year 1942. Since then no other instance has arisen and this fund has been gradually accumulated. Appellant argues that the amount of this fund is so insignificant in comparison with the risk involved that it ought not to enter into the corporation's net worth. To this appellee makes answer that Exhibit C (the producer's contract) provides in part: Section 3 of the Association's covenants that the guaranty has a condition precedent that unless written notice of nonpayment is given before the 1st of the second month following delivery, and that no such notice had been given and that no liability had or could attach against the Association for the fiscal year of 1948. It is further asserted by appellee that this sum of $14,927.97 is not kept separate and apart, but is commingled with capital structure funds and is so used, as displayed by the corporation return. The evidence further discloses that of the 4c a hundredweight withheld by the Association from the producer's milk check ½c thereof is set aside for this Bad Debt Contingency Fund.

Subsection (d) of §5498 GC places some discretion in the Tax Commissioner for only upon satisfactory proof must he find that the value of corporate assets exceeds the fair value thereof. He found, as shown by the Company report, that accounts receivable amounted to $5,305.51 and that accounts payable amounted to $3,179.05; that no notices were filed by producers to protect the guaranty of any amounts due them; that a separate account was not maintained and the reserve fund was commingled with capital assets and used as such. He, no doubt, recognized that if this inconsiderable sum was

recognized as a proper reserve, it might be augmented to a much greater one and that by reason thereof cooperative associations would secure a benefit and preference above corporations no longer countenanced by present statutory law. In view of these facts we are unable to reach a conclusion that appellee abused his discretion or that appellant was discriminated against.

Was appellant aggrieved by the Tax Commissioner's order refusing to allow the $18,050.45 (undistributed refunds for prior years) as a deduction from its book value in arriving at its fair value? The Commissioner did allow it current undivided refunds of $3504.91. Appellee found, as the evidence discloses, that the association, through any corporate action, never made any effort to repay these sums to the producers entitled to their just portion thereof, many of whom are now dead or otherwise retired therefrom as members. It also appears that this sum is mixed with other sums and used just the same as its capital assets were used. It is not shown or treated as a trust fund as now claimed. Out of each hundredweight of milk sold by a producer, 4c of the price paid the producer went into appellant's treasury. Two and a half cents thereof was retained by it for operating expenses. As stated by a company officer, "we" have apparently deducted from the producer's checks more for expense than was actually needed, and this excess makes up the patronage fund which has been accumulating over a period of about eight years.

**Sec. 10186-13 GC** provides in part that:

"* * * The association shall limit its dividends on stock to any amount not greater than eight (8) per cent per annum; and all other net income, less specified reserves which shall be provided for in the by-laws, shall be distributed back to its members on the basis of patronage. * * *."

It will be noted that this section does not provide when distribution on the basis of patronage shall be made. Neither is any time specified in the Association's by-laws. No corporate action has been taken to that end. **Sec. 10186 GC** authorizes such an association to adopt a plan for distribution. It further states that "* * * profit arising from the business may be divided among stockholders from time to time, as it deems expedient, in proportion to the several amounts of their respective purchases." Here again the time element is left in abeyance. There can be no question that this sum of $18,050.45 represents corporate income from prior years. It is just as true that it also represents undivided profits to be distributed to producer stockholders according to patron-

age. **Sec. 5498 GC** specifically directs that "undivided profits" shall be included in ascertaining the value of shares of stock of any corporation.

The Board deems it well to point out at this time that **§10186-4 GC** as amended **120 O. L. 331** effective August 27, 1943, under the powers of such Association, provides in part:

"(e) To establish reserves and to invest the funds thereof in bonds or in such other property as may be provided in the by-laws."

which the appellant has not as yet seen fit to do. We would further call attention to the limitation upon an association's power contained in subsection (1) of the same section, which reads:

"* * * and in addition, any other rights, powers and privileges granted by the laws of this state to ordinary corporations, except such as are inconsistent with the express provisions of this act; * * *."

In his order the Tax Commissioner aptly cites from Packel on The Law of the organization and operation of Cooperatives, Section 45 (d), page 151:

"One of the most convenient methods for a cooperative to increase its capitalization is to refrain from declaring patronage refunds. In the case of equal ownership of all the assets of a cooperative, it would undoubtedly be contrary to the principle of patronage refunds to transfer surplus to contributed capital. To refrain merely from declaring patronage refunds, however, avoids that difficulty and permits the money to be used for the purpose of the cooperative. * * *."

It is the Board's judgment that this is the course pursued by appellant's Board of Directors. By retention of patronage refunds beyond what might be considered a reasonable time without objection by stockholder producers, it has temporarily, at least, increased its capital structure. Appellant ought not to complain of that which its course of inaction deliberately brought about. Finding no error in the order complained of, the same is in all respects affirmed.